UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:14-cr-00188-MOC-DSC

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| PAUL EDWARD BAALERUD, | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the court on Defendant's Motions to Suppress (##14, 15). The court held a hearing on the motions on March 17, 2015. Having considered the motions, the pleadings, and the credible testimony offered at the hearing, the court enters the following findings, conclusion, and Order.

## FINDINGS AND CONCLUSIONS

### I. FACTUAL BACKGROUND

In considering the facts underlying the claims for both of Defendants' motions, the court notes at the outset that it heard sequestered testimony from four witnesses at the hearing: 1) Detective Aleta Dunbar, Charlotte-Mecklenburg Police Department ("CMPD"); 2) Detective Brian Chilton, CMPD; 3) Special Agent John Wydra, Federal Bureau of Investigation; and 4) Special Agent Kevin Kimbrough, North Carolina State Bureau of Investigation. The court finds all of their testimony to be credible. The relevant facts that gave rise to Defendant's motions are as follows.

As noted in the government's brief (#17), many investigators around the world are conducting child pornography investigations on "peer-to-peer" networks in order to locate

1

people who are receiving and distributing child pornography. Dets. Dunbar and Chilton routinely conduct these types of investigations on computers that are seen sharing suspected child pornography on peer-to-peer networks in the Mecklenburg County area. A "peer-to-peer" network is essentially a collection of computers that are connected via file sharing software, which is accessed through the internet. As the Ninth Circuit has explained, peer-to-peer programs

> connect network participants directly and allow them to download files from one another. To download a file, a [peer-to-peer program] user opens the application and inputs a search term. [The peer-to-peer program] then displays a list of files that match the search terms and that are available for download from other [peer-to-peer program] users. When a user downloads a file using the [peer-to-peer program] network, he or she causes a digital copy of a file on another user's computer to be transferred to his or her own computer.

United States v. Flyer, 633 F.3d 911, 913 (9th Cir. 2011) (citation omitted). Testimony at the hearing indicated that investigators with CMPD use software called "Shareza" that connects to these peer-to-peer networks when conducting investigations. Their software transmits common search terms related to child pornography and can limit its searches to target a single Internet Protocol ("IP") address.[1] Law enforcement officials all over the country use a database called the "Child Protection System" (referred to at the hearing as the "CPS website") to compile IP addresses and/or Globally Unique Identifiers ("GUID"s) (another form of identifying a particular computer) that are suspected of being associated with transmission of child pornography. See Search Warrant (#17-1) at 9. This database is compiled from the results of various automated and

---

[1] IP addresses are a series of numbers that provide identifying information associated with a particular computer at a given time. They are assigned to a computer by an internet service provider. IP addresses are somewhat akin to telephone numbers, but unlike a telephone number, which is assigned to a particular phone, an IP address may be assigned to many different computers over time. For example, a person who takes a laptop from his house to his office to a coffee shop in one day and connects to different internet servers at each place may be assigned three different IP addresses that day.

2

manual search tools, which uncover information such as GUIDs, IP addresses, file names, and the date and time that CPS identifies the suspect computer.

As noted above, Det. Dunbar conducts investigations of computers that are seen sharing suspected child pornography in the Mecklenburg County area. Using the GUID information of a computer that CPS had previously identified as likely being in this area, Det. Dunbar identified a suspect computer that appeared to have over 300 files of interest. Using the CPS system, she identified two IP addresses associated with the GUID and attempted to download files from them. Between December 5, 2013, and January 7, 2014, Det. Dunbar successfully downloaded fifteen files, including videos of child pornography, from a computer associated with one of these IP addresses. Using an administrative subpoena, Det. Dunbar determined from AT&T Internet services that Defendant was the internet subscriber associated with the IP address at the date and time of the download. AT&T also provided Defendant's address in Charlotte. Further investigation of DMV records indicated that Defendant lived in an apartment at that address.

Det. Chilton also conducts online undercover investigations to locate individuals who are distributing and receiving child pornography via peer-to-peer networks. On November 18, 2013, Det. Chilton's computer connected to the same IP address that Det. Dunbar was investigating, and downloaded six files that contained videos of child pornography.[2] Det. Chilton testified at the hearing that he found the IP address that was later associated with Defendant's computer on the CPS website.

Based on her information, Det. Dunbar sought a state search warrant for Defendant's apartment, (#17-1), on January 9, 2014. In the search warrant application, Det. Dunbar explained

---

[2] The court notes that Defendant claims by his motion (#15) and affidavit (#15-1) that the information gathered during the investigation conducted by Det. Chilton on November 18, 2013 was also used to obtain the search warrant. However, only the information gathered from Det. Dunbar's investigation was included in the affidavit for the search warrant. See Search Warrant (#17-1).

3

how peer-to-peer software works, described the CPS system, articulated how she downloaded the files containing child pornography from Defendant's computer, and detailed how she was able to identify the computer that the files came from. See (#17-1). Det. Dunbar then executed the search warrant in the morning of January 10, 2014, along with several other law enforcement officials, including several police officers with CPMD and SA Wydra with the FBI. Defendant was the sole resident of the apartment. Det. Dunbar testified that she went to Defendant's apartment to execute the warrant, read him the warrant, gave him a copy, and told him why she was there and that he was not under arrest. Defendant asked her if he needed an attorney; Det. Dunbar told him that the decision was up to him. He then allowed Det. Dunbar to enter his residence. Defendant was never handcuffed or otherwise physically restrained.

Among the items seized during the execution of the search warrant were a computer and an external hard drive. Forensic examinations were performed on these items and child pornography was located. Additionally, evidence of the peer-to-peer program "FrostWire" was also located, with the file sharing feature enabled.

While officers executed the search warrant, Defendant agreed to speak to Det. Dunbar and SA John Wydra. The three sat in the living room of Defendant's apartment during this conversation. Defendant was informed that he was not under arrest and that he was free to leave, but that the officers wanted to question him about activity related to child pornography. SA Wydra testified that by that time, approximately ten visibly armed officers were present in the apartment, but that all except Det. Dunbar and SA Wydra were in the back bedroom gathering evidence while Defendant spoke with Det. Dunbar and SA Wydra in the living room. During the conversation, SA Wydra was armed but his weapon was not displayed; Det. Dunbar's weapon was visible but not drawn. The front door of the apartment, which opened into the living room

4

and was visible to Defendant, remained open the entire time. Defendant never asked the agents to leave nor did he attempt to leave the interview.

Defendant proceeded with the interview and responded to the officers' questions openly and cooperatively. At some point during questioning, Defendant again asked if he needed an attorney. SA Wydra told Defendant that he could not advise him on that issue. Defendant continued to speak with the agents. After a series of questions which ultimately led Defendant to confess that he had downloaded child pornography on his computer, Defendant agreed to make a recorded (audio) statement. In that statement, after some hesitation, Defendant acknowledged that he knew that the software he used to download child porn was also used to share such files with other users through the peer-to-peer program installed on his computer. Despite this admission, SA Wydra testified at the hearing that he was not confident that Defendant knew that he had been sharing child pornography files with other users. Toward the end of the interview, SA Wydra asked Defendant if he needed to make any calls or let his employer know where he was. Defendant declined. When questioned about whether he had ever had any sexual contact with children, Defendant denied such conduct. He also agreed to take a polygraph exam.

After the interview and after Det. Dunbar and SA Wydra left Defendant's apartment, Defendant drove himself to the CMPD North Division Team Office where he met SA Kimbrough with the North Carolina State Bureau of Investigation. SA Kimbrough conducted the polygraph examination and related interviews in a conference room. The polygraph exam was not recorded. Defendant was not restrained and was told that he was free to leave. Prior to beginning the examination, Defendant was given a Polygraph Release Form, which he read and signed. (#16-1). In this form, Defendant acknowledged that he was voluntarily taking the polygraph and that he consented to being interviewed. SA Kimbrough testified that Defendant

5

also read aloud the statement, "I fully realize that I am not under arrest or in custody, and I am not required to take this polygraph exam. Nevertheless, I voluntarily request and authorize SA Kimbrough to now proceed with the polygraph examination," and then signed his initials next to the statement. Id.

During the polygraph examination, Defendant had difficulty with some questions, and ultimately admitted to masturbating in the presence of his children when they were young. Following these admissions, Defendant retook the polygraph examination, which was then limited to questions involving children other than his own. Defendant made no further incriminating statements. SA Kimbrough testified that Defendant never asked for an attorney or asked to leave the polygraph exam. Defendant was not given, nor did he ask for, a break in between the two rounds of questioning.

At no time on January 10, 2014, did any government officer read Defendant his Miranda rights.

## II. FIRST MOTION TO SUPPRESS (DEFENDANT'S STATEMENTS)

### A. Defendant's Contentions

Defendant moves the court to suppress any statements made on January 10, 2014, "while in control of the government," (#14), as well as any evidence obtained as a result of those statements. Defendant states through his affidavit (#14-1) that on January 10, 2014, around 8:00 a.m., armed officers demanded to enter his home, informed him that he was not free to leave, and seized his phone when he said that he wished to call his attorney. Defendant further states that prior to being questioned that morning by such officers, he asked for an attorney several times. Defendant states that during the questioning, he agreed under physical (surrounded by armed individuals) and psychological (isolation from counsel, friends, and family) coercion and

6

ignorance of the law to submit to a polygraph examination. He further avers that the statements made in his home and during the polygraph examination at the CMPD, which discovery shows will be offered against him at trial, were uninformed, involuntary, and coerced, and should therefore be suppressed pursuant to Federal Rule of Criminal Procedure 12(b)(3)(C). Though Defendant does not cite any legal authority in his motion, the court presumes that he challenges the admissibility of his statements based on the Fifth and Fourteenth Amendments. See Dickerson v. United States, 530 U.S. 428, 433 (2000) ("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.").

**B. Discussion**

The Fifth Amendment to the United States Constitution guarantees that "No person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V. Pursuant to this protection against compelled self-incrimination, "[a] confession made during a custodial interrogation will be suppressed unless police advise the defendant of his [Miranda rights], and the defendant knowingly, intelligently, and voluntarily waives those rights." United States v. Holmes, 670 F.3d 586, 591 (4th Cir. 2012) (citations omitted). Prior to any custodial questioning, the suspect "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Statements elicited in noncompliance with this rule may not be admitted as part of the prosecution's case in chief.

7

Stansbury v. California, 511 U.S. 318, 322 (1994). However, absent formal arrest, Miranda warnings are only necessary "where there has been such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam). Statements obtained during a non-custodial interview, then, are admissible. United States v. Hargrove, 625 F.3d 170, 177 (4th Cir. 2010). Put another way, there is no infringement on the suspect's Fifth Amendment rights absent custodial interrogation. United States v. Hornsby, 666 F.3d 296, 309 (4th Cir. 2012) (citing Edwards v. Arizona, 451 U.S. 477, 481–82, 486 (1981)).

Additionally, and relevant to this particular case, even where a suspect is in custody and has been properly given his Miranda warnings, any requests for an attorney must be clear and unambiguous. See Davis v. United States, 512 U.S. 452, 459 (1994) ("if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning….[rather], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.") Once a suspect in custody "states that he wants an attorney, the interrogation must cease until an attorney is present." Maryland v. Shatzer, 559 U.S. 98, 104, 130 (2010).

The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (internal quotation marks omitted). In making such a determination, the court must consider "how a reasonable man in the suspect's position would have understood his situation" relative to being in

8

custody. Id. at 442. "In conducting this inquiry it is important to remember that '[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'" United States v. Hargrove, 625 F.3d 170, 178 (4th Cir. 2010) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam)).

As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence. United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove by a preponderance of the evidence that the challenged evidence is admissible. Colorado v. Connelly, 479 U.S. 157, 168 (1986).

Here, the court first considers whether Defendant made any statements during a custodial interrogation. In light of the factual circumstances described above, the court finds that Defendant was not in custody when he spoke to Det. Dunbar and SA Wydra in his home. The court has considered how a reasonable person in the Defendant's position would have understood his situation relative to being in custody and finds that Defendant's freedom of action was not curtailed to a degree associated with formal arrest. Specifically, the court finds it significant that when officers arrived to search his apartment, Defendant was told that he was not under arrest and that he was free to leave. See United States v. Hargrove, 625 F.3d 170, 180 (4th Cir. 2010) ("a statement…that the interviewee is free to leave, is not 'talismanic' or sufficient in and of itself to show a lack of custody. However, it is highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was 'in custody.'"). Additionally, Defendant was questioned in his living room, a place familiar and comfortable to him. See id. ("although the setting of the interview is not singularly dispositive, an interview at a

9

suspect's residence tends to be more neutral than one that occurs at a law enforcement facility. A more relaxed environment usually indicates less formal police control over the location or the defendant…"). The court also finds it significant that Defendant talked freely with the questioning officers, answered their questions cordially, and agreed to make a recorded statement. The court also notes that the fact that there were several armed officers in Defendant's apartment does not in and of itself create a custodial situation here. See id. at 179 ("While between ten and fifteen agents participated in the initial execution of the search warrant, only two agents were with [Defendant] during the interview. Moreover, [Defendant] testified that he was never placed in handcuffs and that although [interviewing agents] were armed, their firearms were not drawn during the interview and they did not threaten him. The mere presence of armed law enforcement officers during the interview is not sufficient to create a custodial situation."). Finally, the court notes that Defendant sat within view of his open front door during his interview and that he never asked to leave.

The court finds that Defendant was not in a custodial situation when he made statements during his interview in his home, and that, accordingly, the questioning officers were not required to read him his Miranda rights. See United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001) (upholding the district court's finding of a non-custodial situation where [Defendant] was told she was not under arrest, was not handcuffed or otherwise restrained, the agents did not draw their weapons in her presence, and where she was questioned in her own home). Despite the fact that the Defendant asked at least twice if he "needed an attorney," the testimony elicited at the hearing indicated that the officers present at the search warrant execution and the interview responded appropriately given that Defendant was not in custody.[3] The sequestered testimony of

---

[3] The court notes that in his affidavit (#14-1), Defendant states that he asked for an attorney several times prior to questioning and that his phone was seized when he asked to call his attorney. As stated at the hearing, the court has

the agents indicates that Defendant did not clearly and unambiguously ask for an attorney at any time.

The court has also considered whether Defendant was in custody when he made statements at CMPD and finds that he was not. The court finds it particularly significant that Defendant drove himself to the police station for the polygraph exam after voluntarily agreeing to take it. Moreover, once he arrived, Defendant signed a form acknowledging that the exam was voluntary, that he was not required to take the exam, and that he was not under arrest or in custody. See (#16-1). The court is satisfied that a reasonable person would not have believed he was in custody under the circumstances. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (finding that defendant was not in custody "or otherwise deprived of his freedom of action in any significant way" where he voluntarily went to the police station, was immediately informed that he was not under arrest, and left after a 30 minute interview.). Accordingly, because he was not in custody, no Fifth Amendment violation occurred. See United States v. Hornsby, 666 F.3d 296, 309 (4th Cir. 2012).

The court next considers Defendant's contention in his motion that he made "uninformed, involuntary, and coerced" statements on January 10, 2014, in his home and at CMPD, and his statements in his declaration that he agreed to submit to a polygraph exam under physical and psychological coercion and ignorance of the law. Though Defendant does not state the legal basis for his argument, the court presumes that Defendant is alleging violations of his Fifth Amendment right against self-incrimination and/or his constitutional rights to due process.

---

considered the statements made in Defendant's affidavit but, as Defendant did not testify at the hearing, the court was unable to make a determination as to his credibility. Regarding the exact circumstances of Defendant's statements or requests for an attorney, the court finds that all of the government's witnesses on the subject were credible. Both SA Wydra and Det. Dunbar testified that when Defendant asked if he needed an attorney, they told him that they could not advise him on that issue. Defendant never specifically asked for an attorney or asked for questioning to stop. The court also notes that as to Defendant's statement that his phone was seized, the search warrant explicitly identified Defendant's cell phone as an item to be seized. (#17-1 at 3).

As noted above, the Fifth Amendment provides that "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This protection against self-incrimination extends to statements that are: (1) compelled; (2) testimonial; and (3) incriminating. United States v. Sweets, 526 F.3d 122, 127 (4th Cir. 2007). The Fifth Amendment also guarantees rights to due process by prohibiting the United States "from depriving any person of life, liberty, or property without due process of law." U.S. Const. amend. V. See also United States v. Hornsby, 666 F.3d 296, 310 (4th Cir. 2012) ("due process protections against the federal government are found in the Fifth Amendment."). The Due Process Clause of the Fourteenth Amendment, which limits state conduct, similarly provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. See also Hornsby, 666 F.3d at 309 ("The Fourteenth Amendment's Due Process Clause affords individuals fundamental guarantees against state action."). As due process relates to involuntary statements, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). "The voluntariness of a statement is to be determined from the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987) (internal quotation and citation omitted). Voluntariness depends on a determination of whether the defendant's will has been overborne or his capacity for self-determination has been critically impaired. Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)).

Here, the court finds no evidence of any coercion, threats, or force being used against Defendant and that his statements to the police were not compelled, but rather, entirely

voluntary. As noted above, Defendant gave statements to law enforcement agents in a comfortable, familiar environment. He was informed that he was not under arrest and that he was free to leave both his apartment and the police station. Though there were approximately ten visibly armed officers in Defendant's apartment, none of them had their weapons drawn. There is no indication that any officer made physical contact with, or made physical threats toward, Defendant, or that he was in any manner restrained. The court does not find that the mere presence of officers in Defendant's home amounted to physical coercion.

Similarly, the court finds no evidence of psychological coercion. Any alleged "isolation" from counsel, friends, and/or family that Defendant felt was self-imposed; he lived alone and chose not to call anyone when asked if he would like to do so. More pointedly, Defendant drove himself to the polygraph examination and signed a form at CMPD acknowledging that his agreement to take the polygraph was made without threats, duress, coercion, force, promises or immunity or reward. (#16-1). Defendant is college-educated. There is no indication that he did not understand that he was voluntarily agreeing to take the polygraph exam and speak to the agents, or that he otherwise failed to understand the voluntary nature of the situation.

Accordingly, the court does not find that defendant's will was overborne or that his capacity for self-determination was critically impaired at any time on the day that he gave statements to the police. Considering the totality of circumstances, the court does not find that law enforcement obtained statements from Defendant in a manner that offends his right to due process, nor does it find that Defendant was compelled to make the incriminating statements that he did to law enforcement.

For the reasons explained herein, Defendant's first motion to suppress will be denied.

### III. SECOND MOTION TO SUPPRESS (PROPERTY SEIZED FROM DEFENDANT'S COMPUTER AND HARD DRIVE)

### A. Defendant's Contentions

Defendant moves to suppress any evidence seized from his computer on November 18, 2013, and December 5, 2013, by CMPD detectives because he contends that the searches of his computer were conducted without his knowledge or consent. He also moves to suppress any property seized on January 10, 2014, pursuant to the search warrant issued on January 9, 2014, arguing that the search warrant relied on information gathered through the allegedly unlawful searches on November 18, 2013, and December 5, 2013. Again, Defendant does not cite to any legal authority or provide any facts to support his argument, but the court presumes that the Defendant challenges the searches and seizure pursuant to the Fourth Amendment. The court first considers the government's action relating to Defendant's legitimate expectations of privacy in the child pornography files that he downloaded and shared with other internet users. The court also considers whether probable cause supported the magistrate's issuance of a search warrant for Defendant's apartment.

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Fourth Amendment is a personal right that must be invoked by an individual. Minnesota v. Carter, 525 U.S. 83, 88 (1998) (citing Katz v. United States, 389 U.S. 347, 351 (1967)). An individual's "capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection ... has a legitimate expectation of privacy in the invaded place." Id. (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). A person has a legitimate expectation of privacy where: 1) that person has a subjective expectation of privacy and 2) that expectation is one society is willing to recognize as reasonable. United States v. Castellanos, 716 F.3d 828, 832 (4th Cir.)

cert. denied, 134 S. Ct. 832, 187 L. Ed. 2d 692 (2013). Upon a motion to suppress, "[t]he burden of showing a reasonable expectation of privacy in the area searched rests with the defendant." United States v. Gray, 491 F.3d 138, 144 (4th Cir. 2007).

Here, in light of the fact that Defendant has put forth no evidence that he had a legitimate expectation of privacy in the files that he shared with members of the public through a peer-to-peer network, the court finds that he has not met his burden of showing any such expectation. The court also notes that while the Fourth Circuit has not taken up the precise issue, several other circuits have decided that an individual does not have a reasonable expectation of privacy in files that are publicly available through peer-to-peer file sharing software, such as the software that Defendant used here. See, e.g., United States v. Stults, 575 F.3d 834, 843 (8th Cir. 2009) ("We hold that [Defendant] had no reasonable expectation of privacy in files that the FBI retrieved from his personal computer where [Defendant] admittedly installed and used LimeWire [peer-to-peer software] to make his files accessible to others for file sharing. One who gives his house keys to all of his friends who request them should not be surprised should some of them open the door without knocking."); United States v. Ganoe, 538 F.3d 1117, 1127 (9th Cir. 2008) ("Although as a general matter an individual has an objectively reasonable expectation of privacy in his personal computer, we fail to see how this expectation can survive [Defendant's] decision to install and use file-sharing software, thereby opening his computer to anyone else with the same freely available program.") (internal citation omitted); United States v. Borowy, 595 F.3d 1045, 1048 (9th Cir. 2010) ("Despite his efforts, [Defendant's] files were still entirely exposed to public view; anyone with access to LimeWire could download and view his files without hindrance. [Defendant's] subjective intention not to share his files did not create an objectively reasonable expectation of privacy in the face of such widespread public access.");

15

United States v. Conner, 521 F. App'x 493, 497 (6th Cir. 2013) (unpublished) ("peer-to-peer file sharing is different in kind from e-mail, letters, and telephone calls...computer programs like LimeWire are expressly designed to make files on a computer available for download by the public, including law enforcement. Peer-to-peer software users are not mere intermediaries, but the intended recipients of these files. Public exposure of information in this manner defeats an objectively reasonable expectation of privacy under the Fourth Amendment.") (citing Katz v. United States, 389 U.S. 347, 351 (1967)). The court finds that Defendant, who chose to download computer files through peer-to-peer software and then offer to share such files with other members of the public, had no reasonable expectation of privacy in those files. Here, detectives were able to download child pornography from Defendant's computer because he made them available through the peer-to-peer network. Finding that Defendant has no reasonable expectation of privacy in such files, the court does not find that the government's search of his publicly available computer files violated his Fourth Amendment rights.

The court also notes that Defendant argued at the hearing that he challenged the way in which law enforcement officers use the CPS system to compile information (i.e. gathering IP addresses) about particular computers suspected of transmitting or possessing child pornography. As Dets. Dunbar and Chilton both testified, however, CPS only gathers information that is publicly available—IP addresses of computers connected to peer-to-peer networks that are suspected of downloading child pornography. The court fails to see how gathering thousands of IP addresses, which can be assigned to various computers over time and therefore do not, alone, identify a particular person connected with a computer, constitutes an unlawful search of a person. See Katz v. United States, 389 U.S. 347, 351 (1967) ("the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or

office, is not a subject of Fourth Amendment protection."). Law enforcement officials routinely collect public information while attempting to gather leads in criminal investigations. Upon the information and testimony before the court, which indicates that the CPS system only collects publicly-available information, nothing about the government's use of the CPS system here appears to violate a person's reasonable expectations of privacy. Accordingly, the court finds no Fourth Amendment violations based on CMPD's use of the CPS system or its collection of public information about peer-to-peer software users.

The court next considers Defendant's Fourth Amendment rights in the context of a warrant issued for probable cause. The fundamental right to be free from unreasonable searches and seizures "is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." California v. Carney, 471 U.S. 386, 390 (1985). When a federal court reviews a search warrant issued by a state magistrate or a superior court judge, the judicial officer's determination of probable cause is entitled to great deference. United States v. Wellman, 663 F.3d 224, 228 (4th Cir. 2011); United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004). "Thus, 'the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" Hodge, 354 F.3d at 309 (quoting Illinois v. Gates, 462 U.S. 213, 238–39 (1983)). This court must limit its review to considering "only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996).

"The probable cause standard 'is not defined by bright lines and rigid boundaries' but 'allows a [judicial officer] to review the facts and circumstances as a whole and make a common sense determination' whether there is a fair probability that evidence of a crime will be found."

United States v. Wellman, 663 F.3d 224, 228 (4th Cir. 2011) (quoting United States v. Grossman, 400 F.3d 212, 217 (4th Cir. 2005)).

Here, the court finds that probable cause supported the issuance of the search warrant. As explained above, Defendant did not have a reasonable expectation of privacy in the files that he shared on the peer-to-peer network. Det. Dunbar lawfully obtained information that Defendant possessed and offered files containing child pornography to members of the public, including law enforcement agents, through peer-to-peer software. A careful review of the application for the search warrant and Det. Dunbar's sworn statements about the details of her investigation therein indicated a fair probability that evidence of a crime would be found on Defendant's computer. Therefore, the judge issuing the search warrant could appropriately rely on it. Having considered the testimony of Det. Dunbar at the hearing, which the court found to be highly credible and unshaken by cross examination, it is readily apparent that the search warrant was fully supported by probable cause. The court finds no basis to suppress the evidence seized pursuant to this valid search warrant.

The court, finding no violation of Defendant's Fourth Amendment rights, will therefore deny his second motion to suppress.

### IV. CONCLUSION

For the reasons explained herein, the court finds that the government's actions in this instance did not violate any of Defendant's constitutional rights and were entirely within the boundaries of law. The statements obtained from Defendant on the morning of January 10, 2014, as well as the evidence seized from his apartment subject to a valid search warrant, will not be suppressed. The court will therefore deny both of Defendants' motions.

### ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motions to Suppress (##14, 15) are **DENIED**.

Signed: March 25, 2015

Max O. Cogburn Jr
United States District Judge